We appreciate your cooperation. As you know, for purposes of argument, we've consolidated the first three cases this morning, 16-1814, 16-1815, and 17-1051, Soft Gel Technologies v. Jarrow Formulas. You're going to have to help me pronounce your name, but why don't you stand up? May it please the Court, the Board's inconsistent decisions in these three related cases highlight its legal error as well as the lack of substantial evidence to support its findings. As such, the Board's conclusion that the claims of these three patents are unpatentable should be reversed. First, I'm going to address the Board's analysis of anticipation. The discovery in this case for all three patents is basically that CoQ10 can be dissolved in D-limonene. The claims in all three cases in 18-14, the claims are directed to the final formulation, so they're directed to a soft gel capsule or a packaged nutraceutical formulation. Same thing in 18-15, the claims are to the final formulation. The claims are directed to a solubilized CoQ10 formulation or a packaged nutraceutical formulation. And in 10-51, the claims are directed to making the soft gel capsule. In each of these claims, you'll see that the claims require that the CoQ10 be dissolved in D-limonene and that in the final product there's not an emulsion. And that's where I want to start first. In the 10-51 case, the board specifically found that the Nozal or Kahn reference only teaches use of an emulsion. If you read the reference itself, it's always the same approach. They take CoQ10, they put it in lemon oil, then they melt it. And when it's melted, they add a emulsifier plus one other ingredient. It cools, it becomes solid, and then they can load it in a soft gel capsule or wherever they want. But the fact that they always emulsify and make it an emulsion gets it outside the scope of the claims that are in all three patents. Now, the Kahn patent recites both in the specification and in the claims that the process results in thereby solubilizing, i.e. dissolving. You agree that solubilizing and dissolving mean the same thing? In our patent, that's true. Solubilizing and dissolving mean the same thing. But just in chemistry generally, that's certainly undeniable, correct? Well, it may be undeniable in chemistry, Your Honor, but in the Kahn patent itself, when they were saying the solubilizing aspect of the Kahn patent, in fact, the reason in the Kahn patent, solubilize can't mean dissolve, is there's a sentence in Column 6 where it says, due to limited solubility of the CoQ10 in fixed oils. If you read the background section of the Kahn patent in Column 2 or Column 1, they specifically highlight the problems in the prior art regarding being able to dissolve CoQ10. But now, Nassau's declaration seems to me to address this issue, and Nassau's declaration states that there is liquefying or dissolving as well as the melting. In other words, the melting then facilitates the solubilization. So it seems to me that for purposes of what the evidence shows as to the relationship between the melting and the solubilization, Nassau's declaration is quite important. Nassau's declaration is important, but it actually goes in the other direction. So if you focus in on Paragraph 4 of Nassau's declaration, and I think that's where everybody's focused, is if you look at those sentences, what he's saying is you've now got CoQ10 in lemon oil, say, and you then melt it. At that point, you've got a liquid CoQ10 with lemon oil. That liquefication is not dissolving, that's melting. You think that Nassau doesn't understand the difference between dissolving and melting? Because he says in Paragraph 6, he's quite explicit in saying that the higher amounts of the molten, i.e. already melted, CoQ10 can be dissolved or solubilized. Now, he seems clearly to distinguish between melting and solubilization there. At that point, you've already got the CoQ10 and the oil in a liquid state. Right. And then all they're doing is then adding the emulsifier to it to make an emulsion. That is all Nassau ever does. And there's no evidence, if you look at the DSC charts that they've used in there, both in the application and in the PhD thesis, it's all to interpret melting. There's nothing anybody points to to say there's some additional energy change that causes this immiscibility where now there's a dissolution on top of that. The only evidence you have is really in Khan or Nassau, they're actually trying to figure out what they can do as an alternative to dissolving. And so what they focus in on is melting the CoQ10 with oil. And they've got the CoQ10 and the oil, they melt it. And after they melt it, they add an emulsifier to it and one other ingredient. It cools, it becomes a solid emulsion. If you look at in column six, they call that the resultant emulsion. In column 11, in every instance, it's the same approach. And in every instance where they end up is an emulsion, never, and certainly not a solution, you think. I'm sorry? And not a solution. Not a solution. Well, and yet we have on column two of the Khan patent at lines 58 through 60, the SNEDS improves the dissolution of poorly soluble compounds such as the CoQ10. That is to say that the process that is used in Khan results in an improvement in dissolution. Why is that not saying exactly what the board found, which is that there is solubilization? That SEDS is different from what's going on here where... So take that sentence just by itself. Reading that sentence for the moment, let's just read it in itself. That sentence seems to me to support the board's finding. I'm sorry, you're on. Which sentence are you on? Column two, lines 50, 57, 58 through 60, through 61, actually. And it seems to me your argument is ultimately that Khan and Nizal were saying solution, but they meant emulsion. No. So if you read those sentences that you have there, it's exactly what I'm saying. So what they do is they have the drug. When they say in this case, the oil phase containing the drug itself, there they've already made that process that I just walked you through, which is they've got, they had the oil, the lemon oil. They had the CoQ10. They put the two together. They melted it. They added an emulsifier and one other ingredient. It cooled. They've got now what they call the fine emulsion droplets. And it's a way to make it available to the body. But that would not be what you would define as dissolving, correct? That is not dissolving. It's notwithstanding that they use that term. Because it is clearly melting. It's the application of heat. I want you to tell me if in fact what you're saying is that Khan and Nizal used the term dissolving, but they didn't mean dissolving as it is uniformly used in the chemical arts. They meant melting and emulsion, emulsifying. Your Honor, in that sentence, I would agree with you that they are not using dissolving in the way it's being defined for the patent set issue. In the patent set issue, it is, dioramine is being used as a solvent to dissolve the solute being CoQ10. With reference to the obviousness question, would you agree that Motoyama does talk about dissolving in the same sense that the patents do? Yes, I would agree with that. And so the only problem with Motoyama as a reference is that it refers to solubilizing in carvone. Yes, carvone. But it definitely includes, you're not suggesting that Motoyama is not solubilizing in the conventional sense. I agree. So Motoyama clearly does disclose dissolving or solubilizing in the same sense as our patent. And one more question and then I'll let you go. Motoyama talks about the particular essential oils that are referenced in Motoyama as including terpenes. So why is that not very close, at least, to specifically identifying limonene, which is a monoterpene? And the reason there, Your Honor, is two or threefold. But let me start with, in Motoyama, what Motoyama came up with was understanding that CoQ10 may be dissolved, or as you put it, solubilized in carvone-containing oils. And so the component that he's focused in on for his invention is the carvone-containing portion of those oils. Now, for D-limonene is not a carvone-containing oil. So to make that leap that D-limonene now would be used for dissolution, there is no suggestion there for it for a couple of reasons. One is even Dr. Khan, in his application for the 786, told the Patent Office, and this is at Appendix 1212 of the 1051, told the Patent Office, this is an unpredictable area. You need empirical evidence to be able to know if something is going to work like this. There is absolutely no suggestion anywhere that you would be able to dissolve CoQ10 in D-limonene. Because the only source, there's not even a mention of D-limonene in Khan or Nizal. But even if you take lemon oil to have a component of limonene, and then you say somehow they would still understand that the component that we're looking at is not L, but D-limonene. Even if you get that far, what Nizal and Khan teach is a melting point reduction method that's an alternative to dissolving. So for someone skilled in the art to all of a sudden say, I will take the lemon oil. I will then intuit that I can get to D-limonene as opposed to any other enantiomer. I will take that. Well, there are only two enantiomers. But still, you'd have to know that that's the one that's L or D. It's got to be one or the other. But if you look at the evidence. That's right, isn't it? That is right. There's two enantiomers. But if you look at the evidence, even Dr. Khan himself in 2004 had a study to see if either of those enantiomers would help in the melting point reduction method. Not in dissolving, just what is the effect? Even if you look at Dr. Nizal's thesis, he specifically says he doesn't understand what components of lemon oil may be helping with the melting point reduction method. No one is talking about dissolving there. They're just talking about their method of the melting point. So they reduce the melting point. They melt it. And then they're able to add the emulsifier and make that solid emulsion and then be able to make their drug of some kind. And so in each instance, there is nothing in the art that would suggest one skill in the art that what you can do is all of a sudden dissolve in D-limonene, much like Murayama did in dissolving CoQ10 in carbon containing oils. What do you make of Murayama's statement that, and this is at 183, that the oils used in the first and second inventions, which he refers to earlier, specific examples of such oils, the essential oils that he's talking about include, and then he has a list, a long list, include terpenes. That would seem to include limonene. But I think in the context of Murayama... That's right, isn't it? It would include, if it's a terpene, it would include D-limonene, or limonene. I agree with that. But the problem is, in the context of Murayama, where he's focused on all those oils, is really the selection he's making for his invention, where he's saying it's dissolvable, is with carbone. It's the carbone portion of it. Certainly, D-limonene doesn't contain carbone. I don't know how many of those other oils, and there are many, many in that list, how many of those contain carbone. But it doesn't sound like he's focusing exclusively on carbone containing oils. I believe he is, Your Honor. Terpenes as a whole are, include... Can you tell me where you see that sentence on the terpenes? That do not have carbone, correct? Yep, and so, can you show me where that sentence is? Yeah, it's at 183, starting at about line 10 of Murayama. Although the oils used in the present first and second inventions were mentioned previously, specific examples of such oils will be further listed, and then he has a very long list. At about halfway through the list, you'll see the word terpenes. What book are you in? I'm sorry, I'm in the 1814 appendix. One of the problems with having three different appendices is the same material appears at different pages. Sorry. It's in the right-hand column, and the reference to terpenes is almost halfway down. So, and that teaching is too broad. There's nothing in the art, given his focus on carbone-containing oils, even the next sentence where he says, among these oils, carbone is particularly preferred oil due to the good solubility of ubiquinone, and given just the general understanding of the art, not just the predictable nature, but even in that same office session that I was talking about in appendix 12-13, Kahn even says, CoQ10 known not to be dissolvable. But he says carbone is particularly preferred, but that means that the patent covers non-carbone oils, correct? Particularly preferred, the implication is the patent is not limited to those. And that would be one read, but there's no evidence that anybody skilled in the art would read. Pretty much the only read, as far as I can see. But no one skilled in the art would read Motoyama to understand that it would cover delimonene. I don't believe that there's evidence to that fact. And the fact of mentioning terpenes is just too broad. I mean, I can understand your argument that it's too broad, but to say that it isn't covered seems to me to be outside. And when I say it's not covered, it's not explicitly called out by name, but it's called out by category. It's called out by category, but it's a force for a tree where the invention here is very specific to something that the inventor discovered. But the point that I'm trying to get at, and I think you would agree with me that, well, maybe you wouldn't, but it does look like what Motoyama is saying here is that I'm not limiting my invention to carbones. Would you agree with that? And he's trying to say that, but I think one skilled in the art would not give him delimonene based just on that sentence because he would not possess it. That's a different point. That's the overly broad point. Right. The question that what this seems to go to me is to say Motoyama is not limited to carbones. And your honor, I mean, there's a way to read that. I mean, that's what he's trying to do. But I think one skilled in the art, when they read it, I don't think would. I understand your argument. I'm just going to touch on a couple more things, and then I'll do the rest on rebuttal. Can I just, before you move on from obviousness, do I understand it correctly that if we agree with the board on obviousness, that resolves all three cases? Yes, it will. So on obviousness, we've hit Motoyama, but on the Kahn basis for obviousness, again, in 1051, the board found that Kahn is not a good basis for obviousness. And for the same reason that I've mentioned before, which is in Kahn, every embodiment, always the same. They make an emulsion, and then that's what's used. And in Kahn, there's no mention of delimining. In fact, in Motoyama, there's no mention of delimining. The fact that our claims are very specific to being able to be dissolved in delimining, and the fact that Kahn does not actually teach dissolution, but rather a melting point reduction method, which is the alternative to dissolution, shows that it's actually a teaching away and can't be combined. And for all those reasons, the board's finding of no obviousness based on Kahn should foreclose the board from being able to use it in the other two cases. Well, the Motoyama obviousness rejection was Motoyama combined with Kahn and other references, I think, right? Yes. And the problem, other than they're using Kahn, none of them actually mention delimining specifically. Not delimining, although Nizal mentions limining. Nizal only mentions limining in this context. When he's suggesting this would be a subject for investigation at the end of his thesis. Exactly. But not something that can be used. And in fact, when they did study it, they only studied it with regard to seeing if it can further help on the melting point reduction method, not as a substance that can then dissolve CoQ10. OK. Good morning. May it please the court. Mark Giratano with McCarter in English for the Upelli jar of formulas. First, with respect to melting versus dissolving. The only evidence of record on melting, the only evidence of record on what is really happening here is set forth in Kahn and Nizal. Kahn and Nizal, they set forth really in ad nauseum detail exactly what's occurring when you put CoQ10 in a volatile essential oil, like lemon oil or like peppermint oil or spearmint oil, as disclosed in Moynihan. And what Kahn and Nizal show is that when you put a sufficient amount of volatile essential oil in the presence of the CoQ10, it reduces the melting point of the CoQ10 such that it liquefies the CoQ10. It turns it from a solid crystal into a liquid. And now you have two liquids that form a solution. They dissolve. And Kahn explicitly states this. Kahn explicitly states at column, well, first I should explain. Well, what is the mechanism? You agree that they are first turned into an emulsion, right? No, I do not. You don't agree? They never turn into an emulsion? Absolutely not. There is never an emulsion until... Notwithstanding that Kahn refers to the emulsion. Yes, he does, Your Honor. But so the peculiar thing about this case is each of you has to argue. It seems to me that Kahn doesn't really understand chemical terminology. You're saying Kahn didn't understand the term emulsion. And your opposing counsel is saying that Kahn didn't understand the term solution. Oh, yeah, well... Is that really where we are? Let me try to clarify, Your Honor. Let me try to clarify. Because what Kahn is very clear on is that he first dissolves, he first melts and thereby solubilizes the CoQ10 in the essential oil. And he's very clear on that. He explains Nizal in the dissertation thesis. Nizal and Kahn are one and the same, essentially. And Nizal explains in his dissertation thesis that the SNEDS, which is the Self Nano Emulsifying Drug Delivery System, that's what Kahn invented, a Self Nano Emulsifying Drug Delivery System. Emulsifying being the word that catches one's attention here. Of course, Your Honor. And so let me try to clarify that. So what he does first is he mixes the CoQ10 with the volatile essential oil and he creates his formulation. Why does he do that? He does that because he wants to melt the CoQ10 and liquefy it. Both are incontrovertible. So we get to liquid. But the question is, what's the nature of that liquid? Now, well, that liquid is once you, by definition in this case, once you solubilize, which means dissolve, you have a solution. Well, yes. But we haven't gotten there yet, right? We've all we've done is we've melted the CoQ10. And then we have the lemon oil around or the limonene or whatever essential oil is used to reduce the melting point. Yes, Your Honor. But the next question, the critical question, to me at least, is what is it that tells us that that melted CoQ10 and the essential oil turn into a solution as opposed to an emulsion? OK, let me. So walk me through that. Yeah, let me take it at least two places, OK? The two places I'm going to go is I'm going to go to the CONPAT in column 19. And then I'm going to go to the Nizal Declaration. I'm going to start there. And then I'm going to explain to you about emulsions, OK? So let's start with CONPAT in column 19. This is where he's claiming his snags. Yeah, I discussed this with your opposing counsel, the claim language about solubilization. Yeah, so he says you have a sufficient amount of volatile essential oil to solubilize the ubiquinone. So this essential oil solubilizes it. And then he says, Your Honor, to thereby solubilize the ubiquinone. So you melt. What he says is he says wherein the volatile essential oil is present in a sufficient amount to reduce the melting point of ubiquinone to 37 degrees C or below. 37 degrees C is the human body temperature. So what he wants to do is when this is ingested into the body, he wants it to melt. Of course. OK, so it turns into a liquid and forms a solution with the lemon oil. Forms a solution. Now, that's the critical question because your opposing counsel says he misused the term solubilize at that point in the claims and in the rest of the patent when the term is used. He says the rest of the patent makes clear that what he's creating is an emulsion, not a solution. Now, again, I want you to show me why that's not true. OK, so, well, number one, he says that you melt and thereby solubilize. OK, so when, first of all, if we look at the definition of dissolve that was adopted by the board in this case. Well, I know the board and probably any first year chemistry student except apparently Mr. Kahn, Dr. Kahn probably was absent that day. But any first year chemistry student would say dissolve means turn it into a solution, not an emulsion. But the problem is we have to grapple with the argument that this was a misuse in light of everything else we have about Kahn talking about emulsions. This is a misuse of the term solubilization. Why is that true? Or why is that not true? OK, well, I'm going to get to that sentence that they're latching on to. Before I get there, let me try to explain physically what's happening with Kahn's formulation. What he does is he takes the CoQ10 essential oil and when he creates his SNEDs, he combines it with what's called a surfactant and a co-surfactant. Surfactants and co-surfactants are emulsifiers. Right. Emulsifiers allow you to maintain an emulsion. What's key, though, is that it does not form an emulsion until it is put into an aqueous environment. And that is very clear throughout his patent. OK, so what he's saying is his whole goal here is to create a capsule. The capsule has in it a formulation. That formulation has no water. That formulation has CoQ10, essential oil, surfactant, and co-surfactant. Then what he says is when this is ingested into the gut at 37 degrees C, now I'm going to reduce the melting point of the CoQ10 so it becomes liquid. I'm going to create a solution and it's going to disperse because it's in the presence of water and it's going to create an emulsion inside the gut. And that is when he creates an emulsion. Why does he want an emulsion? He wants an emulsion when it's in the gut because he wants to disperse these micro droplets throughout the aqueous environment of the gut. The surfactant and the co-surfactant is what enables him to do that. So he's not an emulsion, your honor, until he puts it in the presence of water. And I will submit to you that his disclosure is very clear on that. Well, let's look at example two and particularly column 12. Help me with this. Yes. The first sentence on the top of column two, the SNEDS was then allowed to cool at ambient temperature for 24 hours until a viscous paste was obtained. Nanoemulsion-absorbed granular material was obtained from the mixture. Isn't that referring to an emulsion? This is the embodiment. Let me say two things here. But that's an emulsion, right? Well, let me see. He uses the term self-nanoemulsifying drug delivery system. Right. So he's a little loose at times, I will admit, with how he describes his self-nanoemulsifying. But I will submit to you that when he describes his... Here he's making a dry paste, okay? Without an aqueous... The aqueous, you say emulsifying aqueous environment is not present. So according to you, this should be a solution at this point. Well, no, it's not a solution because it's at room temperature. Well, okay, but if it were raised, if you raised it to 37C, it would be, right? Yeah, it can't be an emulsion there, Your Honor, because it's solid. For there to be... Well, but solid because it's at room temperature. But if you raised it, it would become liquid. And you say it would be solubilized. Is that right? Yes, at that point. And not an emulsion. Not an emulsion until you put it into the gut. So it simultaneously becomes a solution and an emulsion in this embodiment. Because what's happening is, first of all, this can't be an emulsion. Why? Because an emulsion is defined as when you've got two liquids that are immiscible. Here you've got solids. It's a powder. What he's doing is he's... See, what Kahn wants to do in this particular embodiment is he wants to create a dry, powdered snet. And he wants to compress it so that when you ingest it, then it will become a nano emulsion. So it doesn't become an emulsion, though, Your Honor,  As described right there, it's a solid. So by definition, it cannot be an emulsion. So his use of the term emulsion is explained by what? How do you explain the fact that he refers to it as an emulsion? He just made a mistake? You said he used a loose language. Is that what's going on? Well, in that particular... I haven't studied that sentence, Your Honor, but I think when you look at this reference as a whole, I think he's very clear when he's talking about emulsions, he's saying the resultant emulsion after you put it in water and you stir it. I mean, he also goes on to... He explains elsewhere, unambiguously, that the sneds is not an emulsion, and it doesn't become an emulsion until it's put into an aqueous environment. If we look, for example, at Nassau, at his dissertation thesis, at... And by the way, I'm in the appendix. I apologize, I'm a different one than you. I'm in 1051. All right, I'll use it. Okay. Okay, so he, at appendix 849, which is page 19 of his thesis, under the heading SEDS and SMEDS. SEDS is Self Emulsifying Drug Delivery System. SMEDS is Self Micro Emulsifying Drug Delivery System. Then he uses SNEDS later in that paragraph, Self Nano Emulsifying Drug Delivery System. Micro versus nano just depends on the size of the droplet when it's in the gut. So he says in the first sentence, he says, Self Emulsifying Drug Delivery Systems, SEDS, and Self Micro Emulsifying Drug Delivery Systems, SMEDS, are not micro emulsions. He says they're not emulsions. Then he explains, if we go down to the end of that paragraph, on the top of the next page, he explains that on the last sentence, he says SEDS and SMEDS, I'm sorry, SEDS and SNEDS with an N, which is the term he uses in 786. Nano emulsion. Nano. Can therefore be defined as isotropic solutions of oil, surfactant, cosurfactant, and drug, which form O slash W, which means oil in water, micro emulsions, when introduced into aqueous phases under gentle agitation. So what he's saying here is it becomes a micro emulsion when it's introduced into an aqueous environment under gentle agitation. He then goes on, Your Honor, and when we look at the examples where Softgel argues he's always saying it's an emulsion. What he's saying in each of those cases is that, that they point to, is that when you stir it, he says there is a resultant emulsion. Because you've put it in water and now it results in an emulsion. And we submit that's clear. There is one very clear ambiguity in this case with use of the word emulsion, okay, and that's in connection with example two in the 786. That's the one we were just looking at. Yes. Well, not that exact language, but I'll tell you the language that was latched onto by Softgel and initially relied upon by the board in reaching his decision to reverse the obviousness rejection based on Kahn, the board then, that was the first case the board handled. We then had oral argument on the other two cases where we clarified with the board this issue. The board then went back and reversed itself and said, uh-uh, there is no evidence that Kahn has an emulsion, that the SNED is an emulsion until it's introduced into water. Well, they came out differently in those two cases. They didn't reverse their decision in the first case. Yeah, poor use of it, yeah. Um, and so, uh, uh, and so if we look at example two, which is, uh, and if we look at line, uh, this is the, this is the line that Softgel will point to, which is, uh, column 11. This is a page 804 of the, uh, of the appendix we're referring to. Column 11, line, uh, uh, 65. And he explains here that, first of all, he explains in the first, in the beginning of that paragraph how he creates the SNEDs. Essentially, it's oil, co-Q10, it's lemon oil, co-Q10, surfactant, co-surfactant. And then what he explains here is he says, the resultant emulsion was mixed with a stirring bar until a transparent solution of SNEDs was obtained. So Softgel has grabbed onto that to argue that, okay, he says it's an emulsion. Sounds like it's exactly the opposite of the, of the mechanism that you've just been describing. It's, this is the one sentence, Your Honor, that is ambiguous. It's internally inconsistent and, quite frankly, makes no sense. So he should have said, uh, was mixed with a stirring bar. The resultant solution, Yeah. not emulsion, was mixed with a stirring bar until a transparent solution, emulsion. Or the resulting formulation, the resulting formulation, Right, but starkly put, he's gotten both of the terms wrong, as you, in your view. Well, I, I, not the transparent solution part. Oh, well, you got something right. Well, yeah, I mean, I mean, I think that is the one mistake. I mean, the sentence doesn't make sense. By definition, an emulsion cannot be a solution. One cannot be the other. So by saying that the emulsion became a solution, it's a physical impossibility. But you're saying that the solution became an emulsion when it was added, when it was put in an aqueous environment. Yes. Well, the solution itself is emulsified in the water. So the, the, the cocutanin oil doesn't itself, that still remains a solution. It's a micro droplet. There's micro droplets of oil and water, which themselves are little micro solutions of oil and water. Those are suspended in, in, I'm sorry, wrong word. Those micro droplets of cocutanin oil are in solution as micro droplets. They are suspended in water. And that's how they create an emulsion. The water and the oil are immiscible. They cannot dissolve one in the other. Okay. And that's why it becomes an emulsion in water. But when you've got the oil and the cocutanin, those are two liquids and they are, they become a solution. So they're a solution. And those micro droplets of solution are suspended in the water. And you say that the nano droplets, if you will, of cocutanin and limonene are in solution in the micro droplets. In the micro droplets. And then the surfactants, they surround the micro droplets and they help maintain the suspension of the micro droplets in the water because they're emulsifiers. That's by definition what an emulsifier does. So we submit, Your Honor, physically that is what's happening here. Okay. And where's the best description anywhere in this record of that process that you've just laid out? That goes beyond anything that I saw. Yeah. I would submit, Your Honor, that the, you know, I think the best description that helps us, you know, understand that, I mean, the best description, I think to start with, is in Nizal at 849, 850 in the appendix. Because that's where it tells us it's not an emulsion. But that doesn't go as far as your description of the mechanism. No. And you know, Your Honor, I'm sorry, I didn't mean to. That you just gave us. Yeah. Where is it? Uh, he does explain in his patent, and I just can't, you know, right now, get caught. Con or? Con, yeah. Con, it does explain in his patent how, um, let's see, could be in a summary.  Here's a pretty good sentence, Your Honor. Let me go to the summary of the invention in Con 786, Appendix 799. Okay, and if we go down to line 55, this is the summary of the invention. He states, column 2, line 55. He says, Okay, so he's saying that when it gets into the gut, it disperses in these emulsion droplets, which are in nanometer size range. All right. Okay, and then if you go to the latter part of his spec, he conducts a series of turbidity measurements. Because he's very focused on evaluating how this emulsion is created. So when he's talking about, if we go to page 802 at column 7, he explains, you know, visual observations. He's trying to evaluate how this emulsion looks when you put it in water, and whether it creates a transparent emulsion or not. And so, for example, at column 7, line 100, or 99, he has visual observations. Oh, I apologize. You know, these are printed so small, I left my reading glasses in the thing. I think it's 80, roughly. No, I'm sorry. There's no 80s. They only go up to 57. Yeah, boy, my eye doctor would be embarrassed right now. Okay, so where it says visual observations, at, it says, to assess the self-emulsification properties formulation, 50 milligrams pre-melted at 37 degrees C was introduced into 100 mls of water in a glass flask at 25 degrees C. And the contents were gently stirred manually. The tendency to spontaneously form a transparent emulsion was judged. So what he's trying to do there is he's trying to assess, okay, when you put this SNED in water, and I stir it gently, does it spontaneously form the transparent emulsion? Which he's trying to emulate. And you say that is converting the solution into an emulsion. Yeah, well, what it's doing is, to be a little bit more precise, Your Honor, he's not converting those micro droplets themselves. No, no, I understand that. What he's doing is he's creating this nano emulsion, he calls it, which is nano-sized droplets of solution suspended in water. Right, but before the water arrived, it was, you say, a solution. Yes, yes. So the water converts the solution into an emulsion. Yes. Okay. Yes. So, a couple things, Your Honor, while we're on example two, you know, we submit that the only evidence, well, first of all, as I indicated, the board reversed in the 826 case, or 1051 appeal, the board reversed the examiner's rejection, obviousness rejection, based on con dissolved without money on it. And the reason for reversing the examiner, was really based on that one sentence that I pointed to, in connection with example two, where he said the resultant emulsion became a transparent solution. Okay, and we submit that, first of all, the board very carefully went through that, reconsidered it, in the other two cases, and issued a different opinion. We submit that there is no substantial evidence in this patent to support the conclusion that cons sneds is an emulsion. The only evidence that Softshell has pointed to, to support that, is that sentence. That sentence we submit is not evidence. That sentence is internally inconsistent and ambiguous, and is no evidence at all. And therefore, we submit that there is an alternative ground for affirmance here, based on the obviousness rejection over con. Now, with respect... And I take it that you think it's an appropriate setting for an alternative basis, as opposed to a cross appeal? Yes, your honor. The reason being, we couldn't cross appeal on that issue, because it wouldn't have enlarged the relief. So it wouldn't have changed the reasoning. So, with respect to obviousness and Morihama, and Morihama combined with con Nizal, we agree, first of all, with your honor's view that Morihama does teach that you can use any of a number of different oils that list along laundry lists of oils, including terpenes. Morihama also very clearly says that you can dissolve CoQ10 in an equal amount of... You can dissolve CoQ10 in an equal amount of carvone. And it also says that carvone containing oils, like spearmint oil and peppermint oil, are highly preferred. Con, on the other hand, tells us that lemon oil, peppermint oil, and spearmint oil also melt and thereby solubilize or dissolve the CoQ10. And so we submit that there were any of a number of bases to motivate the person of ordinary skill in the art to substitute con's lemon oil for Morihama's carvone containing oils. Several, several bases. Number one, there's Nizal's statement at the end of his dissertation, where he explicitly states that, and this is at page 1076 of the appendix, he says, based on the present investigation, the following studies may be pursued, among others... Right, that's his final conclusion. Chemical components of essential oils, such as limonene, menthone, and carvone, can be evaluated for their potency. So we submit that right there, that's a motivation of the person of ordinary skill in the art to say, hey, I think I'll try limonene instead of the carvone in Morihama's reference. Secondly, if we look at con, con tells us that lemon oil is actually better than peppermint oil and spearmint oil. Okay, so if we go to con at column seven, con runs a test. This is con on page 802 of the 1051 appendix. In table two, con says, okay, I appreciate that, you know, when you put this in the body, you're not going to have just a binary mixture of CoQ10 and essential oil. You're going to combine it with other stuff, formulation excipients, okay? And so he wants to evaluate what happens when you combine CoQ10 essential oil with other excipients, and how does that affect the melting point depression and the solubilization that results? And so he combines CoQ10 with spearmint oil, peppermint oil, lemon oil, and anise oil. And he combines them with different amounts of cremophore L, which is a surfactant and emulsifier. And so what this table shows, as you put increasing amounts of cremophore L in that formulation, it doesn't melt the CoQ10 any longer for peppermint oil and spearmint oil. So it shows that peppermint oil and spearmint oil, although they work, they don't work necessarily for real high concentrations of surfactant. Lemon oil, on the other hand, melted everything, okay? And so lemon oil worked with all levels of cremophore L. And so what Kahn says here at column seven, line 29, he concludes, essentially, the use of lemon oil appears reasonable and attractive. I submit, Your Honors, that that is a statement that would provide the person of ordinary skill the motivation to try lemon oil over peppermint oil and spearmint oil. That's disclosing the money. He even goes further, because he says he provides one other benefit of lemon oil. He says, furthermore, lemon oil has been used internally as herbal medicine for acidic disorders, such as arthritis and rheumatism, with great benefit in liver congestion. So he tosses in one more reason why you want to use lemon oil over the other oils. Again, providing a motivation to the person of ordinary skill. Then we've got, as another reason, another motivation to make the combination, we've got Softgel's own expert witness in a federal litigation involving the Kahn patent where Softgel's own expert said that the substitution of, and this, by the way, is at page 1,200. Yeah, that wasn't cited in your brief. You cited something that didn't have any of that material. I apologize. I caught that yesterday. OK. We had a typographical error, and we had the wrong study for this. All right. Well, that's OK. We have it. It's on page 1,200. To say it's 1,200. That's the district court's quoting Dasch. Yes, he's quoting Dasch. And so Dasch says that, you know, the substitution of lemon oil for other essential oils is a predictable variation that will be known to one of ordinary skill. At a minimum, it would be obvious to use or obvious to try lemon oil based on the teachings of the prior art. So he was saying, and he was speaking there with reference to Moriama. OK, it would be obvious to use or obvious to try lemon oil and Moriama. So on top of that now, you've got... Was that Moriama or was it... There's a reference in the next line to the Schuck patent. Yeah, the Schuck patent. Yeah, so... Or was he talking about Schuck or was he talking about Moriama? Well, what he's saying is, if we look up above, Your Honor, in the middle of the paragraph above, it says, Dr. Dasch opines that Schuck may be combined with Moriama. OK. So what he's talking about there is combining the teaching of Schuck with Moriama. Right. OK. So what he's saying is, based on that, based on those teachings in the yard, it would have been obvious to substitute lemon oil for the oils of Moriama. But the essential oils that he refers to in that quote are the essential oils of what? Of Moriama. Moriama. Moriama was clear... I mean, we don't have the original Dasch statement. Moriama... Oh, I'm sorry. Moriama was the principle, was the primary 103 reference. OK. And so they were talking about modifying Moriama to arrive at... The issue in this case, by the way, and this sort of touches on that, this touches on their collateral estoppel argument. We submit there is no collateral estoppel. They're not the same issues here. But the issue in this case of this opinion at WET 1200 was whether or not Kahn's claimed invention was obvious over Moriama. Right. OK. And so what Dasch was arguing was that it would have been obvious to modify Moriama in view of Schuck to use lemon oil in Moriama. And therefore, you'd have claim one of the Kahn patent. And then on top of that, back to motivation to combine, you've got both soft gel emits in their patent that both carvone and limonene are monoterpenes. They're the same class of molecule. They can be expected to behave similarly. And therefore, when you make the motivation, there's clearly a reasonable expectation of success for that additional reason. So we submit that there are multiple reasons why it would have been... There was a motivation to combine with a reasonable expectation of success. Your time has expired. Thank you. I appreciate it. It's at 38 seconds, so I could confuse me. Thank you. We're over the red. OK. Your Honor, I'm going to hit dissolution. I understand now, I think, where there may be confusion between what I'm saying and what we were talking about before. So let me be clear, at least, as to what I think is going on. So there's a timing difference. If you look at what's in column two in the lines we were reading for dissolution... Now, which appendix are you using? I'm using the column... I'm using 1814, because that's the one that's fine, right? So it's appendix 493. And Mr. Giortano said this, and I just want to make sure we're all talking about the same thing. When we... When I talk about the process of making SNEDS, and that's in the patent, and I don't think it's really disputed, the process of making SNEDS has no water in it. What they have is... Right. ...cocutane lemon oil. They melt it. Then they add the emulsifier. At that point, they have an emulsion. And then that's what's either put in the soft gel capsule, or in the powdered form, they do something to make it a tablet. And that's fine. But regardless, the starting point for making that, where now you have an emulsion, that paste or whatever that... When you have the cocutane that you've melted in with the lemon oil, you've now added the emulsifier. At that point, you have an emulsion. And that paste is either going to go into the soft gel, or it's going to be in a powdered form. Now, once that final... And that's clearly what's in this patent. I mean, we can go through sentences. In column six, they say the resultant emulsion. In column 11 that you walked through with them, that's the same process. It's the process of making the product. When we're in column two, and we're talking about dissolution here, it's the next step. Now you've got this product. Let's do the capsule version. And you've got what is the SNEDS, which is the four things that are listed in column two. The oil, the surfactant, the drug, and the co-surfactant, which is the beginning. He read that in line 52. It contains the oil, the lemon oil, the surfactant, the co-surfactant. I'm just calling those emulsifiers. And then the drug is cocutane. So that's the final product that is now... That we use the process I went through. They melted it. They added it. They've now made that emulsion. They've loaded it into the capsule. Somebody takes it. And the dissolution there now that we're talking about, because the body now melts it at 37 degrees, you've got fine emulsion droplets. And the dissolution there that we're talking about is bioavailability to the body. It's at a different time. Because when I was first talking to you about the manufacturer, at the manufacturer, there's no water. All there is, is that four steps I said. You have the lemon oil. You have the cocutane. You put them together. You melt it. Now you have a solution of lemon oil and cocutane that was based on that melting. You add the emulsifier. Surfactant, co-surfactant. So there was a solution. Well, when I say solution, it's the melting. It's the resulting of the melting. But you said it's a solution, right? And can we agree that that is dissolved in addition to being melted? No, when I say... Well, you said solution. Yeah, when I say solution, I just mean you have oil and you have cocutane. You melt it. It's a liquid ending, and that's a solution. But it didn't dissolve there. They melted it to get there. Not all liquids are solutions. So is it a solution in the chemical sense? Your Honor, all I meant was now you have cocutane from solid form to liquid form. You meant liquid, not solution. You meant not to say solution. I didn't mean to say solution. Okay. So they're in liquid and then you add the two emulsifiers and then they stir it. But at the end of the day, that becomes the paste that is now in the tablet or the soft gel capsule. When he's talking about then, that is then ingested. That is what the sentences that we've all focused in on from line about 50 to 60 in column two is talking about. So that dissolution that we're talking about there is after you take that tablet, what happens in the gut? But for purposes of our claim where we're talking about how you make the product, at the product level, what Khan teaches in every instance is that process where you end up with an emulsion that you then form into a tablet or you form into a capsule. Now, does it form a solution when it gets into the gut and it's in an aqueous environment? I don't know for sure. Well, that's what Khan thinks. Well, I think at that point though, it's not the final product. It wouldn't even be related to the claims anymore because the claims are to that soft gel capsule. The claims aren't to what happens to the soft gel capsule after it's ingested. The claims are to making that soft gel capsule and the way we make our soft gel capsule, and that's why I said that's the discovery is we've got in the patents, somebody takes D-limonene and dissolves it in, I'm sorry, somebody takes CoQ10, dissolves it in D-limonene and it excludes any emulsion and then they put that in the soft gel capsule and that's the product. If you compare that to what Khan does... I'm a little confused because you seem to be positing some kind of distinction between dissolving something and melting something, right? But if your patent says you take CoQ10 and you add D-limonene and it dissolves and Khan says you take CoQ10 and it is melted by the addition of D-limonene, I don't understand how those two things, which are the same actions, work differently. Is it that you use more D-limonene, which dissolves rather than just melts? Does the D-limonene and CoQ10 stay somehow, even though it's in liquid form, stay somehow separate in Khan and in yours it's dissolved together? That's a great question. Khan doesn't actually say take CoQ10 and put it in D-limonene. What Khan says is take CoQ10 and put it in lemon oil and what Khan found is whatever he did when he put those two together, he couldn't get those to dissolve. That is what he teaches you. He specifically says due to the lack of solubility in fixed oils like this, he actually cannot get them to dissolve. So what he saw in the lab when he put that together, when he put lemon oil and CoQ10 together, by his own words is not dissolution. So then he applies heat. In this case, he's going to body temperature. He's trying to get to a point where he says, if you put enough lemon oil there, you can get the melting point of CoQ10 down to 98 degrees or so. So your body temperature can melt it for the bioavailability piece. That's his goal. But to get there, the way he does that is he's got CoQ10 in lemon oil. He observes those not to have dissolved. So he applies heat. Wait, when does he apply heat? When he's making that formulation. When he's making his formulation, he puts CoQ10. Sorry, just to make clear, when your patent does it, you don't need heat to dissolve it? Nope. In our patent, the way it happens is you just, you have, it's just like salt and water, except the water is D-limonene and the salt is CoQ10. You put it in there. It now dissolves. No matter what the temperature? No matter, at least, there's no limitation in the patent on that. There's no discussion. At room temperature is the example, I think. So at room temperature, it just dissolves. Whereas in Kahn, to be very specific, what he has to do is he takes that CoQ10, puts it in lemon oil. He observes that he cannot dissolve it. And so he then applies heat to melt it. And that liquid, he then adds the emulsifiers to, which then is the resultant emulsion that he then forms into, whether it's a soft gel capsule or whether it's a tablet. That's why it's excluded from all the claims. Our claim is very specific to say that final product is that D-limonene solvent in which you put the CoQ10 in, solute, it's now dissolved. That is in the final tablet. It is not then an emulsion. And we exclude emulsions specifically in the claims, all the claims. And when they're talking about dissolution, at least in column two, it's about bioavailability once you've ingested it. That's a different time than what's in the claims. And that would be also true when you look at the claim of Kahn. Because that claim is to the dietary supplement itself. It's post-manufacture. We're talking about that once it's in, the body is going to melt it. You're going to have something available to the body in those micro emulsion droplets. It's not talking about it at the time you're manufacturing it. At the time you're manufacturing it, what they're doing is taking that CoQ10, adding it to lemon oil, melting it because it's not, they're not, they're not seeing a dissolution. And that's why they're telling you due to the problems with dissolution, we can't get CoQ10 to dissolve. So here's our other approach. We're going to melt it, put it in an emulsifier, and it becomes solid. We can load it. And then in the body, those little emulsion droplets gives you more bioavailability in whatever happens in your gut. The one other, I just want to mention a couple other things that Council mentioned. One is con, and this goes more to the obviousness side. The one thing that's clear from Nizal is they really didn't understand what value, what any component of lemon oil could or could not do. And no one's, and they're very skilled people in the art. They're professors. They're at Texas Tech. They're postdocs working on the 2004 study to figure out what if any, any effect that these chiral components can have. And so it would be impossible to say con himself studied or taught anything with regard to those specific components, in particular D-limon. And then lastly, he brought up Dr. Dosh, and I'll just mention this. In Dr. Dosh, at the time we were putting those in, there was a big debate at the district court and the construction that they were propounding at that time was melting and dissolving were the same. So we didn't have this distinction that we're talking about here. And the district court did find that melting and dissolving were different. Would you agree that the quote from the district court's opinion on app 1200 from the 1051 appendix is both accurate as quoting Dr. Dosh and also referencing the essential oils of Murayama? I believe he was referencing the essential oils of Murayama, Your Honor. Okay. That's all I have. Thank you. Thank you. We thank both.